## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| ERIC DANIEL LIDGETT, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | No. 24-2217-KHV |
| | ) | |
| T-MOBILE USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

On May 23, 2024, Eric Daniel Lidgett filed suit against his former employer, T-Mobile USA, Inc., alleging race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and age discrimination and retaliation in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq. This matter comes before the Court on defendant's Motion For Summary Judgment (Doc. #59) filed August 1, 2025. For reasons stated below, the Court sustains defendant's motion.

## Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of

material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which the nonmoving party carries the burden of proof. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).  To carry this burden, the nonmoving party may not rest on the pleadings but must instead set forth specific facts supported by competent evidence.  Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010).

In applying these standards, the Court views the factual record in the light most favorable to the party opposing the motion for summary judgment.  Dewitt v. Sw. Bell Tel. Co., 845 F.3d 1299, 1306 (10th Cir. 2018).  The Court may grant summary judgment if the nonmoving party's evidence is merely colorable or not significantly probative.  Liberty Lobby, 477 U.S. at 250–51. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251–52.

## **Factual Background**

The following facts are undisputed or, where disputed, viewed in the light most favorable to plaintiff, the non-movant.

In 1998, at age 26, Eric Daniel Lidgett began working at Sprint.  Lidgett is a white male born in 1972.  Plaintiff's first supervisor, Asma Ahmad, rated his performance as follows: "fully met expectations" in 1999, "Very Effective" in 2003, "Less Effective" in 2004–2005 and "Highly

Effective" in 2006.[1]  From 2007 through 2015, plaintiff reported to Mike McCabe, who rated plaintiff's performance as "Meets Expectations" each year.  From 2010 through 2015, plaintiff received glowing feedback on his performance.  In 2016, plaintiff began reporting to Sean O'Neil, who rated his 2016 performance as "Needs Improvement," commenting that plaintiff underperformed in his job duties and needed to be present on a consistent basis to unlock his potential.  In 2016, Brandon Bowman became plaintiff's second-level supervisor.  In 2017, plaintiff began reporting to Will Eckhardt, who rated his 2017 performance as "Needs Improvement," commenting that plaintiff needed to work on time management and was not in the office enough.

On October 23, 2018, Eckhardt gave plaintiff a formal verbal warning which informed plaintiff that he was one of the lowest performers.  Eckhardt communicated to plaintiff that although he was doing his assigned work, his time away from the office created the perception that he was not performing his job.  Accordingly, Eckhardt requested that plaintiff keep a project tracker.  Eckhardt sent a follow-up email asking plaintiff to update his vacation usage, let Eckhardt know how many hours he had left and create an Excel worksheet with his projects and due dates, so they could track them.  In response, plaintiff expressed surprise at the verbal warning, asked why he was receiving a verbal warning for his PTO balance and noted that he was disappointed to find himself in the lowest performers discussion.  Eckhardt explained that the verbal warning was not for PTO but for general performance and further explained that when plaintiff was not in the office, he was not available for ad hoc requests, so other people must cover them.  In 2018 and 2019, plaintiff underwent a bilateral hip replacement which required him to take short-term

---

[1]        T-Mobile was not able to locate plaintiff's reviews for 2000 through 2002.

disability and FMLA leave.

For 2018, plaintiff received a "Needs Improvement" performance rating.  In the comments to his mid-year review, plaintiff received praise for his ability to answer difficult questions, his help in facilitating a process and his willingness to produce analysis for a credit change.  The comments further stated, however, that "[plaintiff] needs to continue to work on time management by adhering to the core required hours of 9 to 4.  [Plaintiff] also needs to work on rebuilding the trust of his teammates on the profitability team by delivering projects on time."  2018 Performance Documentation For Eric Lidgett (Doc. #60-20) at 2.  In the year-end comments, plaintiff received praise for his knowledge about churn and credit, noting that executives outside of finance praised his analysis on a project.  The comments further stated, however, that plaintiff failed to adhere to the core hours of nine to four, failed to deliver some projects in a timely manner and was viewed as an unreliable member of the team.  For 2019, plaintiff received a "Meets Expectations" performance review with no manager comments.

In 2020, when plaintiff was 48 years old, Sprint and T-Mobile merged.  Plaintiff does not claim that he was subject to any discrimination prior to the merger.  In August of 2020, plaintiff began directly reporting to Sherry Chen, and Brandon Bowman remained plaintiff's second-level supervisor.  After the merger, plaintiff became a Senior Analysis on the Consumer Portfolio Strategy team, which was analogous to his old position as a Financial Manager.  T-Mobile expects Senior Analysts to solve problems and overcome obstacles to meet deadlines.  When possible, T-Mobile expects Senior Analysts to resolve data issues or complete their analyses without a resolution and note the impacts that the data problems may have on the analyses.

At the time of the merger, Chen's team consisted of plaintiff (white, 48 years), Lin Li (Asian, 36 years), Nora Zhao (Asian, 25 years), Kevin Liu (Asian, 26 years) and Aarushi Kapoor

(Asian, 30 years).  On Chen's team, plaintiff was the only white individual, the only individual over the age of 40, the only legacy Sprint employee and the only individual located at the location in Overland Park, Kansas.  Chen and the rest of the team members worked in one location in Bellevue, Washington.

Chen had primary responsibility for the CFAM (Credit Facilities Access Management) initiative, which was a software platform that allowed T-Mobile to evaluate existing customers from a credit perspective.  In addition to other duties, Li, Zhao, Liu and plaintiff handled regular reporting and ad hoc projects for the Credit Risk portfolio team.  Chen expected employees to be ready with necessary access to deliver work product.  Kapoor worked primarily on the CFAM project, and T-Mobile expected her to have access to data environments.  On August 17, October 4, October 11, and October 25, 2021, Chen and other T-Mobile leadership instructed Kapoor to gain access to a data environment called Snowflake.  During her time on Chen's team, Kapoor delivered her assignments in a timely manner and her work performance met or exceeded expectations.  Kapoor regularly attended meetings, and, if she missed a meeting, gave notice and an understandable rationale.  For the six weeks leading up to June 2, 2023, Kapoor averaged two days per week in office.  Between June of 2021 and May of 2023, T-Mobile documented more than 30 instances when Kapoor was late and/or overdue on training.

T-Mobile has a Performance Improvement Planning ("PIP") process, which includes four potential steps: (1) Stepping It Up SYNC Discussion; (2) Formal Discussion; (3) Not In Good Standing Discussion; and (4) Separation.  T-Mobile supervisors can skip certain steps or utilize them out of order, but barring "serious policy violation or behavioral outbursts to justify jumping steps to termination," supervisors generally follow the four steps in order.  Manny Morejonreyes Email To Sherry Chen, March 17, 2023 (Doc. #74-2) filed August 22, 2025 at 2.

At the time of the merger, Sprint and T-Mobile had separate data.  T-Mobile immediately began trying to merge Sprint and T-Mobile data and credentials.  T-Mobile did not provide plaintiff T-Mobile credentials until the OneID migration process in February of 2022, and in June of 2023, when it terminated plaintiff's employment, T-Mobile had not completely merged all the data.

On August 12, 2020, Vargas sent an email to his team, including plaintiff, Chen and Zhao, instructing legacy Sprint employees to ensure they got full access to all necessary document drives, databases and SAS systems in Magenta Stack (T-Mobile's data).  His email emphasized that it was the team's responsibility to submit requests, obtain access and learn together about each legacy stack and how to use it.

On September 10, 2020, plaintiff did not join a meeting with the entire Vargas team until Chen sent him a text asking him to join.  Around February of 2022, T-Mobile provided to legacy Sprint employees T-Mobile credentials.  Before that time, legacy Sprint employees, including plaintiff, were working with two calendars and two laptops which did not always synchronize, causing communication and scheduling issues.

On October 8, 2020, plaintiff did not join Chen's team meeting and provided no notice. Chen texted plaintiff 11 minutes after the meeting started, and he said that his daughter's telehealth appointment had just ended.  Plaintiff was not expecting his daughter's appointment to run long, and he immediately joined the meeting after the appointment ended.

In September of 2020, T-Mobile assigned plaintiff a MAP strategy validation project and an M/T Migration project, which had original target completion dates of October 16 and October 23, 2020, respectively.  On October 16, Chen and plaintiff had a scheduled one-on-one meeting, during which Chen hoped to see plaintiff's progress on the M/T Migration.  The morning of the meeting, plaintiff called in sick, so Chen moved the meeting to October 19.  At 8:31 A.M.

on October 19, plaintiff emailed Chen asking to move the meeting to the next day because he had to take his youngest child to a doctor that morning. In his email, plaintiff provided an update on the M/T Migration project, informing Chen that he had pulled certain data for the project and that he was in the process of obtaining additional data.

On or before October 29, 2020, Chen extended the M/T Migration project target completion date to November 30, 2020. As of November 10, 2020, plaintiff had not completed the M/T Migration project, and Chen informed Bowman that she would make clear to plaintiff that he needed to complete it and show progress on another project. As of early December of 2020, plaintiff had not completed the M/T Migration project or shown progress on other projects. The M/T project was not a monthly project—it was ongoing in nature in irregular intervals until all participating teams developed their models, systems and processes.

Because of plaintiff's failure to deliver timely work product, Chen had to reschedule meetings with her managers and other teams. While speaking with Chen about plaintiff's failure to deliver timely work product, Bowman told Chen that plaintiff had comments on his past performance reviews about similar issues. Bowman explained to Chen that plaintiff tended to improve after formal coaching but then revert to problematic performance.

Following the conversation with Bowman, Chen emailed her Human Resources contact, Amanda Estrada. Chen explained that she knew that plaintiff had been on a PIP in the past, and that he again was not performing well, not attending meetings and not delivering results by deadlines. Chen asked Estrada for guidance.

On December 10, 2020, plaintiff did not join a team meeting on time. On December 18, plaintiff had a scheduled one-on-one meeting with Chen, and Chen had asked plaintiff to provide an update on the M/T Migration project as well as other projects. At 6:29 A.M. that morning,

plaintiff sent an email to Chen stating that he was sick. Chen forwarded the email to Bowman and expressed frustration at the frequency of plaintiff's unplanned absences on days when he was supposed to provide updates. She asked who could help her get plaintiff's previous PIP information. Chen did not see any PIP history for plaintiff in Workday.[2] In his reply, Bowman noted that plaintiff tended to do that often—which made Bowman question the legitimacy of plaintiff's excuses. Bowman also stated that Eckhardt could provide information about past PIPs.

As of early January of 2021, plaintiff still had not completed the M/T Migration project. In the early morning hours of January 7, 2021, plaintiff informed Chen and Bowman that he would be out that day to take his wife to a colonoscopy. Plaintiff provided no explanation for failing to provide advance notice for this absence. The T-Mobile employee handbook states that "employees should request time off in advance whenever possible." Employee Handbook (Doc. #60-3) at 30.

On January 21, 2021, Chen spoke with Estrada about skipping the Step It Up SYNC step (the first step of the PIP process) based on plaintiff's prior performance problems. Chen could not locate anything other than plaintiff's 2018 performance review and a project tracker, and she expressed frustration to Estrada about having to start from the first step of the PIP process. At 8:03 P.M. that night, plaintiff informed Chen and Bowman that he had unidentified appointments out of town the next day, providing no explanation for the lack of notice. Plaintiff also informed them that he was able to meet with another team member over the weekend, walk through the projects and make updates, and that he would schedule a review for the coming week.

On January 13, 2021, Chen, Bowman and Eckhardt communicated about locating performance documentation from before the merger, which led to a discussion between Chen and

---

[2]    The parties do not explain what Workday is, but the Court assumes it is a T-Mobile database used to track PIPs and other information.

Eckhardt. During that discussion, Eckhardt informed Chen that he had the same concerns she did—that plaintiff seemed to have the ability to do the work but was unreliable, regularly failed to meet deadlines and often had unexpected absences when projects were due or meetings were set to discuss his projects. Eckhardt also told Chen that plaintiff tended to improve after performance discussions but then revert to his old ways.

On January 22, 2021, Chen delivered to plaintiff a Step It Up SYNC. It discussed plaintiff's need to improve in meeting deadlines and time management issues such as pushing or not attending scheduled meetings without prior notice. It also stated that the M/T Migration project had been rescheduled at least three times, most recently to January 15, 2021. It identified three "changes that need to happen:" (1) "deliver analysis and project based on agreed upon deadline," (2) "attend meeting as scheduled, provide at least 48 hours advance notice if meetings need to be rescheduled along with valid business related reason" and (3) "adhere to 9 to 5 core business working hours central time zone." Stepping It Up SYNC (Doc. #61-35).

In February of 2021, plaintiff received a one per cent increase and 75 per cent of the individual component of his bonus. Chen explained to plaintiff that his performance problems affected his merit increase and bonus. For annual raises, T-Mobile gives managers a budget for their teams, along with recommended percentages based on employee performance. T-Mobile employees also receive a bonus target that has both an individual component and a company component. The company component is based solely on the company's performance, and the individual component is based on individual performance. If an employee is meeting expectations, he or she typically receives 100 per cent of the individual bonus potential; if an employee is exceeding expectations, he or she typically receives more than 100 per cent of the individual bonus potential; and if an employee is not meeting expectations, he or she typically receives less than

-9-

100 per cent of the individual bonus potential.  Managers input their recommendations into the system for the next level up to review.

In January of 2021, plaintiff ended the analysis state of the M/T Migration project while other teams performed their work on the project.  On February 4, 2021, Chen submitted the project to the "sig deck team," Bowman and Vargas.

On February 23, 2021, at 2:36 P.M., plaintiff informed Chen and Bowman that he would be out the next day because he had to drive his father-in-law to an appointment that was three hours away.  He provided no reason for the lack of notice.  On March 1, 2021, plaintiff informed Chen and Bowman that his brother-in-law had died unexpectedly, so he would be out of the office for two days.

As of late March of 2021, plaintiff still had an unusual number of unexpected absences, but he had begun to deliver more timely work product and seemed more engaged, and Chen was unable to demonstrate that plaintiff failed to meet the PIP requirements.  Chen reached out to Estrada and expressed concern that she would experience similar cycles of plaintiff's performance improving then regressing.  In response, Estrada instructed Chen to stick close to plaintiff's performance, to provide plaintiff with email recaps for constructive feedback and to let Estrada know if plaintiff's performance declined again.

On April 28, 2021, plaintiff took an unplanned day of PTO.  On April 29, 2021, plaintiff told Chen that he would be out the following Monday and Tuesday taking care of his sister-in-law's kids while she had open heart surgery.

On June 7, 2021, plaintiff was out of office for a funeral.  On July 13, 2021 at 3:12 P.M., plaintiff informed Chen and Bowman that he would be out of the office from July 14 through 17 to pick up the rest of his family from out of town.

In July of 2021, T-Mobile asked its managers to complete a review of their employees' soft skills and ability to work with diverse teams.  Chen rated plaintiff highly in those areas and commended his great analysis and contributions.  Chen also stated that she would like to see plaintiff take a more leading role in developing impactful analysis as the Yellow and Magenta portfolios integrated and reach out more to others, "especially those with certain knowledge that he may be lacking (for example Magenta data)."  Evaluation (Doc. #60-45) at 5.

On August 20, 2021 at 9:40 A.M., plaintiff informed Chen and Bowman that he would be out of the office that day because his wife and son were sick.  On August 27, 2021 at 9:04 AM, plaintiff informed Chen and Bowman that he was taking PTO that day.  Plaintiff provided no reason for the lack of notice.

On August 30, 2021 at 6:22 A.M., plaintiff informed Chen and Bowman that his daughter's "hearing aid was taken yesterday while she slept" so he would be out of the office that day and the next to help his daughter get hearing aids.

On September 9, 2021 at 8:49 A.M., plaintiff informed Chen and Bowman that he had several appointments and would be out of office that afternoon and all of the next day.

In September of 2021, T-Mobile's HR department rolled out market adjustments, which resulted in compensation increases for some employees.  Bowman and Vargas pushed back on plaintiff receiving an increase, but HR told them that the increase was not optional and was based on market data, not performance.  Chen and Bowman discussed plaintiff's pay increase, and Chen stated to Bowman that she would emphasize his performance expectations but then requested that Bowman deliver the information to plaintiff.

On September 22, 2021, Chen scheduled her weekly one-on-one meeting with plaintiff for the next day.  Chen planned to discuss performance expectations with plaintiff.  At 6:11 P.M.

(within four hours after he received Chen's invitation), plaintiff sent Chen an email stating that he was taking PTO the next day because his father-in-law was suffering from sepsis, and he had taken him to the ER. Plaintiff asked Chen if they could reschedule the meeting to Friday, but Chen was out on PTO that day. Chen forwarded the email to Bowman asking for advice and noting that plaintiff's unexpected absences had become more common again. In response, Bowman called plaintiff, and the two had a five-minute phone call where Bowman informed plaintiff of the pay increase and stated that with the raise, it is important for plaintiff to deliver and keep up the good work. Bowman followed up with an email to plaintiff providing the details of the increase stating that it is a "pretty sizable change so it is important to make sure you are delivering on your objectives." Bowman Email (Doc. #60-54).

The next day, September 24, 2021, plaintiff was scheduled to take virtual training on SQL, a programming language which T-Mobile uses to manage and manipulate data. At 8:21 A.M., plaintiff sent an email to Chen and Bowman stating that he was out sick and would not be able to take the training. Chen responded that she was sorry he was sick and asked if he could try to provide more notice of his absences, noting that other people were on the waiting list for the training and could have taken his spot if he had provided more notice. On September 27, at 3:34 A.M., plaintiff informed Chen and Bowman that because his illness had not improved with antibiotics and he had started steroids and codeine cough medicine, he would be out of work that day.

On October 1, 2021 at 11:00 A.M., Chen and plaintiff had a meeting scheduled. Ten minutes after the meeting was supposed to start, plaintiff had not joined or messaged Chen about his absence, so at 11:10 A.M., Chen emailed plaintiff that she did not see him in the meeting and asking him to provide specific updates by the end of the day. At 11:13 A.M., plaintiff responded

that he was having connection issues and asking if Chen still had time to meet.  By that time, Chen was already on another call and asked plaintiff to send a note with his updates.  Plaintiff did not provide an update by the end of the day.  Among other things, Chen had requested an update on a plan to get the Magenta/Yellow portfolio dashboard summary completed by October 6, 2021, before a meeting with a Vice President.  Plaintiff and Chen scheduled their next weekly meeting for October 8.

On October 5, 2021, plaintiff informed Chen that he would be out of the office October 7 and 8.  Plaintiff informed Chen that his mother had medical appointments in Omaha, Nebraska on those days and further explained that in the last few months, his mother had been diagnosed with several aneurysms that were rapidly growing, causing her to lose her eyesight and interfering with her ability to drive and read, so he was taking his mother to her appointments.

On October 24 at 11:42 P.M., plaintiff informed Chen and Bowman that he would be out of the office the next day because he had been "waiting to get into the VA for over 6 months and got a call that they had a cancellation tomorrow."  Plaintiff provided no explanation for why he was not able to provide this notice until almost midnight the night before.

On August 17, 2021, plaintiff (and many others including Kapoor and Zhao) received an email asking them to get onboarded to Snowflake and transitioned off of PCRBI by September 30, 2021.  PCRBI was a Sprint system, and T-Mobile started decommissioning it in October of 2021.  In September and October of 2021, T-Mobile sent reminders and instructions about how to gain access and stated that it would remove access to PCRBI in November.  Chen forwarded the email chain to her team and asked team members to be sure they all had necessary access to Snowflake.  She noted that she had asked Liu to help anyone who had trouble.  On October 26, 2021, Liu sent a meeting maker to plaintiff and others, including Kapoor and Zhao, inviting them to attend a

meeting to discuss an overview of Snowflake. The Credit Risk leadership team expected all analysts to become familiar with T-Mobile data because ultimately T-Mobile would decommission Sprint databases and systems. At the time, plaintiff was the only legacy Sprint member on his team, and despite his requests to be exposed to T-Mobile projects, his workload involved only Sprint-related databases and systems.

On October 29, 2021, Chen sent her team a project tracker which identified two of plaintiff's 16 projects which had extended deadlines. Some of plaintiff's projects required access to both Sprint and T-Mobile data. By October of 2021, plaintiff had access to T-Mobile data. Late in the day on October 29, plaintiff sent an email to Chen and Bowman stating that he would be out on November 4 and 5 (the day of his weekly meeting with Chen) to help his parents, providing a detailed explanation about his parents' health.

On November 1, 2021, T-Mobile sent another email reminder regarding transition to Snowflake, which included a directive for all production processes to be run in parallel (on both PRCBI and Snowflake). Chen forwarded the email to her team and asked team members to let her know if they had concerns. Plaintiff responded that he had access to Snowflake but was still working to get access to Magenta GRID.

Chen and plaintiff had a meeting set for November 18 to provide an update on his progress for the Yellow base analysis. At 7:52 P.M. the night before, plaintiff sent Chen and Bowman an email stating that he would be out of office the next day to take his wife to an appointment downtown. Plaintiff explained that he was under the impression that his wife's appointment was an out-patient procedure, which is why he had not requested PTO, but that he had just found out that the procedure was an in-patient procedure. Chen responded:

I understand there are family issues that we all need to take care of. But I have

-14-

observed that recently you've taken more time off when there are meetings which need you to show progress on the Yellow base analysis. I want to emphasize that this is a very high priority and we can't further delay the delivery of the result. Please make sure you provide all the updates to Aarushi by tomorrow.

Chen Email (Doc. #60-67).  Plaintiff responded that he understood her concerns and informed her that he was supposed to meet with Aarushi on Tuesday, but she had to cancel.  Plaintiff further stated that he had recently met with someone to figure out a work-around for the deact data, and that he would send an update to Aarushi tomorrow.

On December 13 and 14, 2021, plaintiff took PTO for his mother's surgery and indicated that he might stay in Omaha and work remotely on December 15 through 17.  Plaintiff and Chen had scheduled their weekly meeting for December 16.  Plaintiff did not join the meeting, but he had informed her that he would be staying in Nebraska for the week to handle family affairs after his father's death and his mother's surgery.

On December 19, 2021, plaintiff sent Chen and Bowman an email stating that he would be out the next day because he had tested positive for COVID.  At 9:54 A.M. on December 21, plaintiff sent Chen and Bowman an email stating that he would be out that day as well because he was undergoing a monoclonal antibody infusion to treat his COVID.  Plaintiff also took PTO (which he had requested on December 2) from December 22 through 24 and December 29.

On January 2, 2022, plaintiff emailed Chen and Bowman to inform them that his mother had died, so he would be out of office most of that week.  Plaintiff provided Chen and Bowman information on the funeral home, the time and location of the funeral and a link to his mother's obituary.  Plaintiff stated that he had two or three slides to update, which he would try to do that week.

On January 13, 2022, the date the team was supposed to present the Yellow base analysis,

-15-

plaintiff completed the slides and reviewed them with Kapoor, who decided that he should add an additional view. Plaintiff easily combined the information and added it to the slides that day. Also on January 13, plaintiff asked Bowman for time to discuss a report, and Bowman stated that he had time between 1:30 and 2:00 P.M. At 1:43 P.M., plaintiff sent a message stating that he was running his wife to the ER to get an antibody infusion.

At 3:05 A.M. on February 7, 2022, plaintiff informed Chen and Bowman that he was taking PTO that day.

On February 9, 2022, T-Mobile sent an email to plaintiff and many other legacy Sprint employes, stating that it was aware of an issue connecting Snowflake to SAS after OneId migration. The email identified specific people affected, including plaintiff and another legacy Sprint employee, Rob Wimhurst, who also reported to Bowman, and identified steps to fix the issue.

On February 14, 2022, Christy Boyd, a data analysist, contacted plaintiff for approval of a file so she could have the file upgraded. Three days later, Boyd forwarded her same email to plaintiff to again request that plaintiff review the records to see if they could be approved. Eleven days later, Boyd forwarded the string to plaintiff again, noting that he had not responded and making the request a third time. On March 2, Boyd forwarded the chain to plaintiff again with the same request and copying Chen. Chen then asked plaintiff to make Boyd's request a priority. Boyd also responded to Chen directly and stated that in addition to emails, she had also reached out to plaintiff on Slack and he had not responded. As mentioned, during the OneID migration process in February of 2022, legacy Sprint employees were operating with two email addresses as T-Mobile phased out the Sprint email addresses, which interfered with the functionality of the Sprint email addresses, and plaintiff was not receiving all emails addressed to his Sprint email.

Boyd's emails were addressed to plaintiff's Sprint email address, and he does not recall receiving any of them.

On February 15, 2022, plaintiff did not attend his scheduled meeting with Chen or give her any notice. Six minutes after the start of the meeting, plaintiff emailed Chen stating that he was on a call with his daughter's doctor and would join in a few minutes. Nine minutes later, Chen emailed plaintiff and copied Bowman stating that she could not find plaintiff, asking if he was okay, asking for updates on his projects and making several ad hoc requests. About ten minutes later, plaintiff responded to Chen addressing each of her ad hoc requests and providing a project update.

On February 16, 2022, Chen informed plaintiff of his compensation package for the year. Based on Chen's perception of his performance, plaintiff received only a one per cent increase and 80 per cent of the individual bonus.

On February 18, 2022, plaintiff emailed with David Long from T-Mobile's Platform Administration about his access issues. Based on Long's feedback, plaintiff was able to resolve one of his access issues. Long referred plaintiff to Karthick Somasundaram from SAS Administration for plaintiff's other question. Plaintiff reached out to Somasundaram, who sent onboarding instructions the following Monday. After trying to follow the instructions, plaintiff still had access issues, so he began reaching out to other colleagues at the Overland Park office, including Wimhurst, so they could troubleshoot in person.

On February 25, 2022, plaintiff notified Chen and Bowman that he would be out of office because he was sick.

Plaintiff was out of office on Friday, March 4 and Monday, March 7 for his father's funeral. At 9:21 A.M. on Monday, March 14, plaintiff informed Chen and Bowman that he would be out

sick that day.

In March of 2022, plaintiff reached out to Liu for help with the connection between Snowflake and SAS. In response, on March 16, 2022, Liu forwarded an email to plaintiff that he and others had received in September of 2021. Two days later, Liu followed up with plaintiff to see if he had succeeded with the installation, and plaintiff said that he needed to go to the office to access the network, which he planned to do over the weekend. On Monday, March 21, Liu followed up to see if plaintiff had gone to the office over the weekend. On March 22, plaintiff responded that he was in the office that day and planned to work on the access issue. Plaintiff further explained that he was working on a higher priority project before he could work on access issues. Liu responded and asked plaintiff to let him know if he ran into issues. Plaintiff did not respond to Liu but later that day reached out to Shankar Shrivatsav Rajagopalan from the SAS Admin Team to continue troubleshooting.

On March 22, plaintiff informed Chen and Bowman that he would be out of office for appointments on March 24 and 25. Plaintiff also took PTO the following week.

On April 7, 2022, Liu set a meeting with plaintiff to get an update on his access to Snowflake so they could go through it together. Liu then sent an email to the Snowflake access team to help plaintiff gain access. On April 8, without success, plaintiff continued to troubleshoot the access issues with a member of the Snowflake access team. Plaintiff told Liu of the steps he had taken and stated that they should hopefully be able to continue on Monday. On Monday, April 11, Liu responded and asked plaintiff if he was able to proceed with the next steps, but plaintiff did not respond.

On April 14, 2022, Bowman and Chen decided to assign plaintiff items from the Vargas War Room. On April 29, plaintiff was out of office for an appointment with his daughter. On

May 2 through 4, plaintiff was out of office because he was driving his father-in-law to Ohio and back.

Though plaintiff had met with Liu at least three times in May and June of 2022, Chen and Bowman were becoming more and more concerned about plaintiff's lack of access, and Chen asked Liu about his efforts to help plaintiff. Liu informed Chen that he had tried to help plaintiff multiple times, but plaintiff often did not follow up or attend meetings. Bowman also learned from Sean O'Neil, a group manager for customer profitability, that plaintiff was trying to get very basic access which the other legacy Sprint employees had had for more than a year.

On May 9, 2022, plaintiff scheduled a meeting with Chen to discuss progress on his WAR Room assignments, but at 8:42 A.M., he sent Chen a Slack message stating that he was taking his wife to the "oral surgeon ER" and should be back after lunch. In response, Chen asked if moving the meeting to 5:00 P.M. would be okay. Plaintiff said that would work and would hopefully give him some time to get some responses from the owners in the WAR Room. At 3:32 P.M., however, plaintiff sent another message stating that his wife had been in the ER for a CT scan, and the doctors expected to do surgery that night. Plaintiff stated that he would send an update later that night, but he did not do so.

In May of 2022, two employees on Chen's team, Li and Liu, resigned. The resignations made plaintiff's inability to gain proper access even more problematic because plaintiff had predominantly been working on Sprint-based projects, but Chen redistributed the work of Li and Liu to remaining team members, including plaintiff. Meanwhile, plaintiff had scheduled PTO from May 27 through June 7. Plaintiff had not completed the WAR Room items, but he and Chen agreed that another team member would cover for plaintiff. Plaintiff contacted that team member to facilitate WAR Room coverage for which plaintiff updated all meetings and provided agendas.

At the same time, Vargas was asking Chen and Bowman to assign someone to handle a report known as the Jamie Report that Li had previously handled.

During the first week of June of 2022, a third employee from Chen's team, Zhao, resigned, leaving only plaintiff and Kapoor.

On June 8, 2022, the day when plaintiff was supposed to return from PTO, Eckhardt informed Bowman that plaintiff would not be returning until the afternoon and asked if they would move the WAR Room meeting. Bowman was not aware that plaintiff would not be in until the afternoon, noting that plaintiff had not requested PTO for the morning. Eckhardt cut and pasted plaintiff's message that he would not be in until afternoon. At 11:36 A.M., Bowman sent plaintiff a message asking him about the plan for the WAR Room meeting. Plaintiff did not respond for two hours, so Bowman followed up. Plaintiff stated that his notifications had not been popping up. Because Bowman had learned that plaintiff was not returning until the afternoon, he assumed that plaintiff's statement was false.

In June of 2022, plaintiff did not timely send the recurring Sprint downpayment tracking report (for which he had always been responsible) because it had to be transitioned to the Magenta environment and he did not have access to it. Bowman was frustrated with plaintiff's failure to obtain access when the other legacy Sprint employees under him had access months earlier. Bowman was also frustrated that plaintiff did not access data in other ways, such as through dashboards which were available to everyone. Bowman had also learned from peers that plaintiff did not create some of the reports that he presented.

On June 8, 2022, nearly a year after T-Mobile first instructed plaintiff to run reports in Snowflake, plaintiff sent a Slack message regarding access issues, stating that he had never used Snowflake. On June 9, Zhao sent plaintiff an invitation to discuss the items which plaintiff would

be taking over after her departure, including a list of five items and the access he would need. Notably, Zhao herself did not have access to Teradata at this point. Zhao relied on another team member to run the Teradata portion of her reports, and T-Mobile never placed her on a PIP. She voluntarily resigned from T-Mobile to pursue other opportunities. As of June 6, Kapoor was also troubleshooting her own access issues, meaning that she did not have full access to Snowflake.

By June of 2022, plaintiff had already made extensive efforts to re-gain access following OneID migration. Between February and July of 2022, plaintiff made hundreds of efforts to troubleshoot the data environment access issues with more than 16 different subject matter experts, including emails, slack messages and in-person and virtual meetings. Plaintiff continued to attempt to gain access.

On June 13, 2022, Chen sent plaintiff an email with the following deadlines: (1) Get access to the following applications by June 17: (a) Snowflake, (b) SAS connect into Snowflake, (c) SAS EG, (d) Tableau, and (e) Teradata; (2) Update the HINT analysis by June 17; (3) Update the Jaime Report by June 24; and (4) Learn the Consumer Bad Debt and KPI trends report ("Peter Report") by June 30 and be ready to run the update in July. Plaintiff agrees that the deadlines for 1(a), 1(c), 1(d) and (4) were reasonable. He believes the deadline in (3) was unreasonable and is not sure about the deadline in (2).

Chen wanted plaintiff to learn to run the Jamie report independently, but she also needed to be sure that it was completed, so she and Bowman also assigned the Jamie report to another employee on Bowman's team, Wimhurst, who is white and older than plaintiff.

In May or June of 2022, plaintiff asked other legacy Sprint employees how they were able to establish the connection between Snowflake and SAS. They suggested that plaintiff reach out to Yunan Jiang. Plaintiff did so, and on June 15, 2022, he established the connection. Plaintiff

informed Chen that he had this access but stated that he needed access to more tables.  Plaintiff asked Chen to run the HINT data for him, and she agreed.  At this point, the HINT Report was not yet due.  Chen also stated that the code was not working properly, that she was waiting on another member of the data team to fix it and that it might have to wait until the next day.  On June 17, plaintiff asked Chen if she could also run the Trended HINT code and the New Adds code, which Chen did.

On June 21, 2022, plaintiff had a scheduled meeting with Chen.  On June 20, plaintiff asked Chen to move it to later in the day or to the next day because he needed to attend his son's college orientation.

On June 27, 2022, Chen asked plaintiff to update the Peter deck with May numbers by June 29.  On June 28, plaintiff sent an email to Chen and Bowman regarding the HINT report and acknowledged that he should have spent more time trying to learn Snowflake and Tableau.  Plaintiff further stated that he had identified errors in Zhao's coding that were interfering with his ability to run the HINT report, so he would need additional access to cure Zhao's coding errors.  Plaintiff had run the HINT code, identified the errors in Zhao's code, communicated the errors to Chen and communicated the steps he was taking to correct them.  Chen responded, asking plaintiff to get access to the necessary schemas and set up a time when she could show him how to run the Peter deck code and HINT code.  On June 28, plaintiff messaged Chen to ask what time she had to discuss HINT, and scheduled a meeting for 1:30 P.M., which Chen moved to 12:30 P.M.

As of June 29, 2022, plaintiff had not completed the HINT Report or the Jamie Report, and he was not in a position to run the Peter Report.  As noted, plaintiff had run the HINT report and identified Zhao's errors.  Wimhurst, the back-up on the Jamie Report, had not completed it either and was unable to do so until July 21.  On July 29, plaintiff told Chen that he was working on

getting HINT, Peter and Special Report to run to make sure that there were not any unknown access issues with them. Plaintiff still did not have all the access he needed to run the reports—he was still troubleshooting issues within the data environments. As mentioned, Zhao also did not have access to Teradata and had relied on another analyst to run that step for her. Chen testified that plaintiff had not completed other tasks and required repeated reminders.

On June 29, 2022, Bowman and Chen met with plaintiff to deliver another Step It Up SYNC. The SYNC outlined the following requirements: (1) Gain access to the same applications previously listed by July 8; (2) Deliver the down payments report by the 15th of every month without reminders; (3) Keep PTO tracking up to date; (4) Stay current with all trainings by deadlines (5) Adhere to three days per week in the office; (6) Complete all process and projects by agreed deadlines, including: (a) HINT Report by the second Friday of each month starting with July 8, (b) Jamie Report by July 8 and (c) Peter Report monthly.

Chen testified that her main concern was plaintiff pushing off meetings, especially when things were due, and not meeting agreed-upon deadlines. The SYNC, however, did not mention pushing off meetings—it stated that plaintiff's performance issues were centered around his inability to deliver analysis results in a timely manner and his lack of effort to gain access to the tools required to perform his role.

Plaintiff agrees that all of the SYNC deadlines were reasonable except for the Jamie Report. Plaintiff explained that Wimhurst and the data team had identified issues with the report and could not get it to run properly. Plaintiff explained that T-Mobile assigned it to Wimhurst, who was known as the data/code guy, so that he could cure the coding error that was causing the issues.

On July 5, plaintiff had a meeting scheduled with Chen at 3:30 P.M. At 3:40 P.M., plaintiff had not joined the meeting, so Chen sent him an email asking him to find another time. Plaintiff

did not respond.

As of July 8, 2022, plaintiff had obtained the access he needed but had not completed any of the reports.  In the same time frame, T-Mobile assigned a group outside of Bowman's team to take over the HINT work for all of the credit organization.  T-Mobile asked Chen to transition the monthly HINT report to another team.

On July 12, 2022, Chen gave plaintiff two follow-up assignments and asked him to transition the monthly HINT report to another team.  That same day, Chen asked plaintiff to put his assigned goals into Workday, which T-Mobile required everyone to do.  On July 17, plaintiff texted Chen that his van had broken down, and he was stuck in Ohio for another night.

On July 26, 2022, Chen asked plaintiff to train Kapoor on how to run the Peter Report and related projects.

On July 21, 2022, Bowman and Chen met with plaintiff and issued him a second Stepping It Up SYNC.  On August 3, Chen requested that plaintiff provide an acknowledgement to the July 21 PIP, which plaintiff provided on August 4 along with detailed updates on his projects.

On August 4, 2022, plaintiff sent an email to Manny Morejonreyes and Adam Krupa in HR, and copied Chen, Bowman and Vargas, with responses to the PIP document dated July 21, 2022.  Plaintiff described several instances of Chen and Bowman treating younger, Asian co-workers more favorably than himself, such as allowing Kapoor and Zhao to operate without access to all data environments and permitting them to work and consult with other analysts.  Plaintiff asserted that Chen and Bowman were discriminating against him based on age.

On August 14, 2022, plaintiff spoke by telephone or video with Janis Hite, whom T-Mobile originally assigned to investigate his complaint of August 4.  Plaintiff felt that T-Mobile and/or Hite was deceiving him, so to protect himself and ensure that he understood exactly what she said,

he recorded the call without Hite's knowledge.  Plaintiff took the call from his home, outside of working hours.  On the call, plaintiff represented to Hite that the second PIP on July 21 came before any of his reports were due.  At the time of the call, Hite had not read the complaint that plaintiff had filed ten days earlier.

On August 23—19 days after plaintiff submitted his complaint—Hite transferred the investigation to Jasmin Baker-Kinney because of upcoming PTO.  On September 2, Baker-Kinney informed plaintiff that she would need to hand the investigation off to Corporate Affairs because the complaint implicated Bowman, who was a director.  Plaintiff's complaint had been pending for nearly a month and four HR representatives had passed it around.

On September 19, 2022, plaintiff met with Mark O'Riordan from Corporate Affairs.  O'Riordan had not yet read plaintiff's complaint.  Plaintiff, Chen and Bowman were all frustrated by the length of time the investigation was taking.  O'Riordan interviewed plaintiff, Chen, Bowman, Wimhurst and O'Neil.  Wimhurst had complained about Chen assigning the Jamie Report to both him and plaintiff, and Wimhurst explained to O'Riordan that Bowman misinterpreted his complaints to be about plaintiff.

On September 27, 2022, Michael Tayag, HR, sent O'Riordan a message stating that Chen, Bowman and Vargas were "continuing to push."  On October 20, O'Riordan completed his report, finding that no one had used false information to create plaintiff's PIP and also finding no indication of age discrimination.  During his investigation, based on interviews with Bowman, Chen and O'Neil, O'Riordan learned that plaintiff had a long history of shaky performance and that the current situation fit his usual pattern.  O'Riordan recommended that plaintiff's managers communicate expectations more clearly before moving forward with the PIP discussions.

After plaintiff submitted his complaint on August 4, 2022, HR asked Chen and Bowman

to pause the PIP process while they investigated plaintiff's concerns.

On August 12, August 16 through 19 and August 22, 2022, plaintiff took PTO.

Within weeks of plaintiff's complaint, T-Mobile took him off his WAR Room duties and transferred a number of his duties to different ownership.  On August 19, 2022, Aroon Kumar (Asian, age 33) joined Chen's team, and Chen asked plaintiff to train him on the Peter Report and the Chris Report.  As a result, plaintiff no longer had regular reporting duties assigned to him, and he did not have enough work to work full time.  Plaintiff continued to handle regular reporting for the Peter and Chris meetings.  The Peter Report was due on October 6, 2022, and plaintiff did not meet that deadline.  On November 1, 2022, plaintiff received automated emails, copied to Chen, alerting him that he was past due in completing a training module.

On November 7, Chen asked plaintiff to prepare to review the slides for the VP of Credit Risk, Chris Hoopaw's monthly meeting and the Peter deck.  Plaintiff responded that due to a data error, another team had to restate the portfolio reports and that once they cured the issue, he would update the slides.  Though he did not need to be prepared to review the slides until November 17, plaintiff also stated that he intended to update the slides by the next week.  On November 14, plaintiff messaged James Parrish (who handled consumer and business write-off dashboards) stating that he could not find the sub flow report, and Parrish responded that he did not think they kept those exact views.

On November 14, 2022, Chen sent plaintiff an email which specifically focused on the Auto Pay deck and requested an updated report.  Plaintiff did not respond to that email.

On November 15, 2022, plaintiff received another automated reminder that he still had not completed one of the training modules.

On November 28, 2022, plaintiff informed Chen that he would be out of the office because

he had tested positive for COVID the previous Friday. Plaintiff told Chen that he would be available if she had any questions regarding the Peter Deck and would check his email in the morning.

At 8:50 A.M. on November 29, 2022, plaintiff told Chen and Bowman that he would be out sick that day. Plaintiff and Chen had a meeting scheduled for that day. That same day, Chen emailed Morejonreyes that she would like to restart plaintiff's PIP process. She stated that she would like to kick off the process by reviewing plaintiff's job description with him to align their expectations and list specific tasks to be completed by specific deadlines. In response, Morejonreyes advised Chen and Bowman that before moving forward with the PIP, they should set expectations for all of the Senior Analysts on Bowman's team, so plaintiff knew what was required of them, and identify specific expectations for plaintiff outside of the PIP process. That day, Bowman sent an email to all Senior Analysts on his team to remind them of their responsibilities.

On December 1, 2022, plaintiff sent an email stating that he was still sick and would be working from home for the rest of the week. Plaintiff stated that he was working on the Auto Pay analysis and the Other Write-Off review. Chen had requested the Auto Pay analysis on November 14. Bowman responded to plaintiff's email asking when plaintiff would complete the other Write-Off analysis and indicating that they needed it no later than the end of the day on December 5.

On December 12 and 13, 2022, Chen and plaintiff corresponded about differences in the AAL figures in the charts. Plaintiff answered Chen's questions, and Chen stated that she was good. Chen needed to be able to explain the difference in an upcoming meeting. Plaintiff indicated that he was waiting on additional information about the other Write Off analysis.

On December 13, 2022, Chen met with plaintiff and outlined specific expectations for him. Managers did not meet with the other Senior Analysists to set expectations. Chen asked plaintiff to (1) provide weekly updates on the analyses and set up review meetings when plaintiff reached important milestones, (2) give her weekly updates on his progress and set review meetings when he met important milestones, (3) complete all trainings on time and (4) adhere to the requirement to be in the office three days per week. Chen testified that she originally requested that plaintiff complete the Auto Pay Project by November 17. As of December 13, plaintiff had not completed it. Other than going over Chen's expectations, plaintiff does not remember anything from the meeting on December 13. From December 19 through the end of the year, plaintiff took PTO.

On January 3, 2023, plaintiff emailed Chen and Bowman that he had returned from Nebraska with a respiratory infection, so he would be working from home for the next few days. On January 9, plaintiff informed Chen and Bowman that he would be out the afternoon of January 10 for his daughter's surgery. Plaintiff met the expectation to prepare for the Chris and Peter meetings in January. As of January 23, plaintiff had not completed the necessary monthly reporting. As of January 23, plaintiff had provided some reports on Auto Pay but had not delivered the final deck.

On January 23, 2023, Chen sent plaintiff an email, noting in red that she had not seen the final deck for Auto Pay and asking where he was with establishing the analysis templates in Excel and documenting the code that supported the analysis to understand the monthly performance dashboard trend. Plaintiff did not respond to Chen's email. On January 31 and February 1, plaintiff took PTO. Plaintiff met the expectation to prepare for the Chris and Peter meetings in February. On February 9, plaintiff completed the Auto Pay Project.

In February of 2023, plaintiff received his compensation package for the year, which

included a one per cent increase and 50 per cent of the individual bonus component. Chen told plaintiff the increase amounts were due to his PIP in 2022. On February 10, plaintiff and Chen had a one-on-one meeting. Chen sent a summary of their discussion which included updates in red highlights. In red, Chen wrote that they agreed that plaintiff would find out and tie the numbers between the sub-flow and AAL reports, noting that the project had been dragging for two months and setting a deadline of March 3. Chen gave plaintiff a follow-up assignment on the Auto Pay Analysis with a deadline of February 24. Chen assigned plaintiff an additional ad hoc project, the BTS Analysis. This ad hoc analysis required that Chen push the IOT/HINT deadline to March 17. Plaintiff did not respond to the summary email. On February 16, plaintiff sent four separate meeting makers for PTO, resulting in him taking PTO from February 20 through 24. As a result, plaintiff was not at work on the day the follow-up Auto Pay assignment was due.

On March 6, 2023, plaintiff was ten minutes late to a Consumer Strategy SYNC. On March 7, 2023, plaintiff received an automated email, copied to Chen, indicating he had an overdue training module. On March 10, Chen sent plaintiff an email to remind him that the deadline for the IOT/HINT project was in one week. She stated that in their weekly meetings, she had not seen any progress on that project, and plaintiff had not scheduled any review meetings to discuss important milestones, so she wanted to make sure plaintiff was on track.

At his deposition, plaintiff could not remember the exact time line of when he began working on IOT and HINT. At some point before February 6, however, he began working on the IOT/HINT project, recognized an issue with the data and approached Wimhurst, a data subject matter expert.

In an email to plaintiff dated December 13, 2022 discussing the IOT/HINT Project, Chen stated, "To help you, I can provide SMEs that you need to talk to understand data." <u>Chen Email</u>

(Doc. #61-48).  Three months later, on March 10, plaintiff asked Chen which SMEs he should consult to help resolve the data issues.

At 12:53 A.M. on March 13, 2023, plaintiff sent two separate meeting makers that he was taking PTO that day and the next day.  On March 14, plaintiff received an automated email, copied to Chen, reminding him that the training module for which he had received a reminder on March 7, was still overdue.  On March 15, plaintiff was ten minutes late to a meeting to discuss progress on an IDS fix with the data team.

On March 17, 2023, the date that the IOT/HINT project was due, plaintiff informed Chen that he would be out sick due to a reaction to the shingles vaccine.  Plaintiff further stated that due to data issues, he would need more time to complete the IOT/HINT project.  That same day, Chen told Morejonreyes that she would like to move to terminate plaintiff's employment.  Morejonreyes advised Chen to move to a Not In Good Standing ("NGS") first.  In response, Chen expressed frustration.  Bowman also responded that they needed to let plaintiff know he was in NGS and follow the 90-day evaluation period.

On March 20, 2023, without notice, plaintiff did not attend the bi-weekly team meeting until the last five minutes.  That same day, plaintiff received another autogenerated email, copied to Chen, about a late training module.

On March 24, 2023, Chen emailed a copy of the NGS to plaintiff and met with him.  The NGS set the following project deadlines: (1) AAL/UPG Report by March 27, 2023; (2) Continue monthly reporting for the Chris/Peter meetings; continue to support data validation and report improvement tasks; identify specific devices in the AAL/UPG reports by April 21, 2023; (3) IOT/HINT Project by March 31, 2023; and (4) Develop a CFAM Challenger strategy by May 26, 2023.  The NGS also required plaintiff to stay current on trainings and be in the office

three days per week.  On March 27, plaintiff informed Chen and Bowman that he would be out sick that day due to nausea from new medications.  On April 7, Chen sent plaintiff an email reminding him of the deadlines for the AAL/UPG and IOT/HINT projects.  Plaintiff did not respond to Chen's email.

According to plaintiff, the AAL/UPG analysis was impossible to do.  Chen agreed with plaintiff that it was not possible for him to tie certain numbers in the AAL/UPG analysis.  Chen testified that she was asking plaintiff to conduct an analysis of the reasons the numbers in the reports were different.  Plaintiff testified that Chen had access to the spreadsheets that he had developed when comparing the data.  As of March 31, 2023, plaintiff had not shown Chen any analysis on the IOT/HINT project, though he had informed her of ongoing data issues.

On April 21, 2023, plaintiff had a scheduled one-on-one meeting with Chen.  At 9:52 A.M. that day, plaintiff sent to Morejonreyes, Bowman, Chen and others a complaint of retaliation as well as a response to his NGS.  In it, he outlined the data issues and how plaintiff had otherwise met his deadlines and deliverables.  At 11:54 A.M., plaintiff declined the previously-sent invite for his one-on-one meeting and informed Chen and Bowman that he would be out of the office for the rest of the day and on Monday for personal appointments.  Plaintiff testified that he had extreme anxiety about filing the retaliation complaint that morning, so he was taking a four day weekend to gather himself.  On Tuesday and Wednesday (April 25 and 26), plaintiff worked from home without telling Chen or Bowman, and he accidentally set his Slack status to "away."  On April 27, plaintiff had a scheduled one-on-one meeting with Chen, but he took PTO that day for personal appointments.  On April 28, plaintiff had his regularly scheduled one-on-one meeting with Chen and, without her knowledge, he recorded it.  Plaintiff began the call by talking about the HR process, stating that although he had filed his complaint on April 21, he wanted to be able to

contribute, he did not want the relationship to be adversarial and he just wanted to do the work. Chen said that she did not want to comment on that but wanted to get updates on work. Chen and plaintiff then agreed that they had not recently had a meeting with Peter Osvaldik, Chief Financial Officer, and Chen gave plaintiff an update about the IDS team fixing an invoice table, so they should have that ready for the meeting with Hoopaw the following week. Chen asked plaintiff about things they had been tracking since December. The conversation then went directly into discussing plaintiff's inability to tie the data sets, indicating that the data issue had been a part of the discussion since December. After further discussion, plaintiff said, "So then I'll document in writing and attach my worksheet and explain what I've done to find it and why we can't do it all the way, but generally speaking why we are directionally close." Chen had been asking plaintiff to do that for months.

At the end of the recorded call on April 28, 2023, plaintiff informed Chen that he had completed all his trainings and updated all of his PTO. Chen then asked plaintiff about the status of the IOT/HINT project. Plaintiff said that he reached out to Wimhurst because plaintiff still did not have access to write tables in Snowflake. Plaintiff stated that he would like to think that he could have something done in the next week or two. Chen asked for an update about plaintiff's analysis of the financial impact on the business. Plaintiff responded by expressing surprise that Chen was asking for his recommendation and then discussed resources he could use to complete the project which Chen had assigned in December.

On May 5, 2023, Chen moved plaintiff's one-on-one meeting (which had been set earlier in the day) to 4:30 P.M. At 8:06 A.M. that day, plaintiff told Chen and Bowman that he taken his wife to the ER late last night and that they had returned a couple of hours ago. At 12:47 P.M., plaintiff sent Chen an email stating that he would be picking his wife up from the hospital around

4:30 P.M. so he would not be able to make the meeting.

Without notice, on May 8, 2023, plaintiff did not attend the bi-weekly team meeting where the team shared useful project updates and best practices.  On May 9, plaintiff took PTO for appointments.  On May 12, plaintiff had a regularly scheduled one-on-one with Chen, but he called in sick that day because he had a migraine.

On May 17, 2023, Steve Cox, of T-Mobile's Corporate Ethics Department completed his investigation into plaintiff's retaliation complaint of April 21.  In the course of his investigation, he had met with plaintiff and plaintiff raised the possibility of moving to another team within T-Mobile.

On May 18, 2023, without notice, plaintiff did not attend Hoopaw's monthly meeting.  On May 19, plaintiff had a scheduled one-on-one meeting with Chen, but he took PTO that day stating that his kids were sick and his wife was helping her sister, who had been admitted to the hospital.  On May 26, plaintiff had a scheduled one-on-one meeting with Chen, but he took PTO that day for funeral services in Nebraska.  On June 2, plaintiff had a scheduled one-on-one meeting with Chen, but on May 30, he informed Chen and Bowman that he would be out of the office that day to have a tooth pulled.

On June 1, 2023, T-Mobile terminated plaintiff's employment.  T-Mobile replaced plaintiff with at least one younger Asian individual.

The record does not reflect the exact date, but in 2023, plaintiff completed 25 years with Sprint/T-Mobile.  Though it was standard practice within the Credit Risk department to acknowledge employees' milestone anniversaries, Chen did not acknowledge plaintiff's 25th employment anniversary because she felt that doing so would be disingenuous.

From 2020 through 2022, T-Mobile made group hiring decisions, with each group member

having veto power.  Since approximately 2022, however, individual managers such as Chen made hiring decisions.  From 2021 through 2023, Chen's organization, the Credit Strategy and Collection Strategy teams, had a consolidated hiring process, meaning that various managers across the organization interviewed candidates and decided whom to hire, then where to place those individuals.  Also, managers had veto power, so if they did not like someone, they could refuse to hire them.  Since 2023, individual managers have been making hiring decisions for their teams.  Of the individuals whom Chen supervised from January of 2020 to the present, Chen only personally hired Li and Kapoor.  The applicant pool for positions which Chen typically posts is largely Asian and largely people who have completed their studies relatively recently.

Other than plaintiff, Chen has only placed Li (Asian, born 1993) on a PIP.  Chen afforded Li the full PIP process: a Stepping It Up SYNC, then a formal discussion, then an NGS.  Ultimately, Chen did not terminate Li's employment.

Bowman has hired and promoted many people with a wide range of ages and races.  In the last five years, Bowman has supervised eight employees who were over 50 years of age.  Other than plaintiff, Bowman has involuntarily terminated one of those employees.  During that period, Bowman involuntarily terminated the employment of three Asian employees who were under 30 years of age.  Chen and Bowman are two years younger than plaintiff.  Chen is Asian and was born in 1974.  Bowman is white and was born in 1974.  Chen and Bowman were 49 years of age when T-Mobile terminated plaintiff's employment at the age of 51.

If plaintiff's only performance problem was not completing his training on time, Chen would not have placed him on a PIP.  If plaintiff had delivered his work on time, Chen would not have emphasized the requirement to be in office.  If plaintiff had delivered his work product on time, Chen would have had less concern about his unplanned absences.

On March 20, 2023, plaintiff filed with the EEOC a charge of discrimination which alleged age discrimination.  On April 7, 2023, plaintiff filed with the EEOC an amended charge of discrimination which alleged age discrimination and retaliation for complaining of age discrimination.  On July 13, 2023, after T-Mobile terminated his employment, plaintiff filed with the EEOC a charge alleging race and age discrimination and relation.

On May 23, 2024, plaintiff filed suit against defendant.  Complaint (Doc. #1).  Plaintiff asserts race discrimination and retaliation in violation of Title VII and age discrimination and retaliation in violation of the ADEA.  Pretrial Order (Doc. #52) filed June 26, 2025 at 13–14.  On August 1, 2025, defendant filed a motion for summary judgment.  Motion For Summary Judgment (Doc. #59).

## Analysis

Plaintiff asserts race discrimination, age discrimination and retaliation in violation of Title VII and the ADEA.  Specifically, plaintiff alleges that defendant discriminated against him by (1) issuing the Stepping It Up SYNC on June 29, 2022, (2) issuing the "follow up" to that SYNC on July 21, 2022, (3) issuing the "expectations alignment" of November/December of 2022, (4) issuing the "follow up" to that "expectations alignment" on January 23, February 10 and March 10, 2023, (5) issuing the annual bonus and raise reduction on February of 2023, (6) issuing the Not In Good Standing on March 23, 2023 and (7) terminating his employment on June 1, 2023 and hiring Asians to replace him.  Pretrial Order (Doc. #52) at 12–13.  Plaintiff alleges that defendant retaliated against him by (1) issuing the "expectations alignment" of November/December of 2022, (2) issuing the "follow up" to that "expectations alignment" on January 23, February 10 and March 10, 2023, (3) issuing the annual bonus and raise reduction on February of 2023, (4) issuing the Not In Good Standing on March 23, 2023, (5) terminating his

employment on June 1, 2023 and (6) failing to take any meaningful action in response to plaintiff's complaints of discrimination and retaliation in August of 2022 and April of 2023.  Id. at 13.

Defendant seeks summary judgment, arguing that (1) plaintiff did not exhaust administrative remedies as to race discrimination that allegedly occurred in June and July of 2022 (the first Stepping It Up SYNC and the follow up), (2) plaintiff cannot establish a prima facie case of race or age discrimination, (3) plaintiff cannot establish a prima facie case of retaliation and (4) plaintiff cannot show that defendant's articulated reasons for its actions are pretextual.

## I.    Race Discrimination

Plaintiff asserts that in violation of Title VII, defendant discriminated against him based on race by (1) issuing the Stepping It Up SYNC on June 29, 2022, (2) issuing the "follow up" to that SYNC on July 21, 2022, (3) issuing the "expectations alignment" of November/December of 2022, (4) issuing the "follow up" to that "expectations alignment" on January 23, February 10 and March 10, 2023, (5) issuing the annual bonus and raise reduction on February of 2023, (6) issuing the Not In Good Standing on March 23, 2023 and (7) terminating his employment on June 1, 2023 and hiring Asians to replace him.  Pretrial Order (Doc. #52) at 12–13.

To establish a prima facie case of Title VII discrimination, plaintiff must show that (1) he is a member of a protected class, (2) he experienced an adverse employment action and (3) the adverse employment action took place under circumstances which give rise to an inference of unlawful discrimination.  Walkingstick Dixon v. Oklahoma ex rel. Reg'l Univ. Sys. of Okla. Bd. of Regents, 125 F.4th 1321, 1334 (10th Cir. 2025).  After plaintiff presents a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions, and finally shifts back to plaintiff to show that the employer's articulated reasons are pretextual.  Id. (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).

Defendant seeks summary judgment, arguing that (1) plaintiff did not exhaust administrative remedies as to race discrimination that allegedly occurred in June and July of 2022, (2) plaintiff cannot establish a prima facie case of race discrimination and (3) plaintiff cannot show that its stated nondiscriminatory reasons were pretextual.

A.    Whether Plaintiff Can Establish That He Exhausted Administrative Remedies

Defendant first argues that Title VII's exhaustion requirement bars plaintiff's race discrimination claims based on the SYNC dated June 29, 2022 and the follow-up on July 21, 2022.

To assert claims under Title VII, plaintiff must file a charge of discrimination within 300 days of the dates that he alleges the discriminatory conduct took place.  42 U.S.C. § 2000e-5(e)(1).  Under Title VII, if plaintiff fails to timely file an EEOC charge regarding each discrete employment incident or adverse action, defendant may raise the affirmative defense of failure to exhaust administrative remedies.  Lincoln v. BNSF Ry. Co., 900 F.3d 1166, 1185 (10th Cir. 2018); see Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002).  To exhaust, plaintiff generally must present his claims to the EEOC and receive a right-to-sue letter based on that charge.  Lincoln, 900 F.3d at 1181.  The charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim.  Id.  The charge tells the EEOC what to investigate, provides the opportunity to conciliate the claim and gives the charged party notice of the alleged violation.  See Martinez v. Potter, 347 F.3d 1208, 1211 (10th Cir. 2003).  The timeliness requirement is like a statute of limitations, i.e. subject to waiver, estoppel and equitable tolling. Zipes v. Trans World Airlines, 455 U.S. 385, 393 (1982).

On July 13, 2023, plaintiff filed a charge of race discrimination with the EEOC.  Thus, Title VII's exhaustion requirement bars any claims of race discrimination or retaliation based on events which occurred more than 300 days before July 13, 2023, that is, before September 15,

2022.  Accordingly, the Court sustains defendant's motion for summary judgment with respect to plaintiff's race discrimination claims based on the SYNC dated June 29, 2022 and the follow-up on July 21, 2022.

      B.    <u>Whether Plaintiff Can Establish A Prima Facie Case Of Race Discrimination</u>

Plaintiff's remaining race discrimination claims are based on defendant (1) issuing the "expectations alignment" of November/December of 2022, (2) issuing the "follow up" to that "expectations alignment" on January 23, February 10 and March 10, 2023, (3) issuing the annual bonus and raise reduction on February of 2023, (4) issuing the Not In Good Standing on March 23, 2023 and (5) terminating his employment on June 1, 2023 and hiring Asians to replace him. Defendant argues that as to these employment actions, plaintiff cannot establish a prima facie case of race discrimination.

As mentioned, to establish a prima facie case of Title VII discrimination, plaintiff must show that (1) he is a member of a protected class, (2) he experienced an adverse employment action and (3) the adverse employment action took place under circumstances which give rise to an inference of unlawful discrimination.  <u>Walkingstick</u>, 125 F.4th at 1334.

Defendant does not contest that as a white individual, plaintiff is a member of a protected class.  <u>See</u> <u>Ames v. Ohio Dep't of Youth Servs.</u>, 605 U.S. 303, 309 (2025) (Title VII equally protects all individuals without regard to membership in a minority or majority group).  Defendant argues, however, that as a matter of law, three of plaintiff's claims are not adverse employment actions, and the circumstances of plaintiff's purported adverse actions do not give rise to an inference of discrimination.

      **1.**    **Whether Plaintiff Can Establish Adverse Employment Action**

Defendant argues that (1) the "expectation alignment" of November/December of

2022 and (2) the "follow up" to that "expectations alignment" on January 23, February 10 and March 10, 2023 do not constitute adverse actions.[3]

Plaintiff responds that both of the challenged actions are adverse employment actions because they adversely affected the terms and conditions of his employment by (1) negatively impacting his compensation package, (2) causing him to be removed from his WAR Room duties, (3) inflicting intentionally unrealistic and unmanageable deadlines and (4) causing him to experience anxiety.

In Muldrow v. City of St. Louis, Mo., 601 U.S. 346 (2024), the Supreme Court held that when plaintiffs bring suit under Title VII's discrimination prong, they need not show that harm was "significant" or "any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." Muldrow, 601 U.S. at 355. Instead, plaintiffs need only show "some harm" or "some disadvantageous change" with respect to an identifiable term or condition of employment. Id. at 354–55. The Supreme Court held that Title VII's anti-discrimination provision simply "seeks a workplace where individuals are not discriminated against" because of traits such as race, and "thus flatly prevent[s] injury to individuals based on status, without distinguishing between significant and less significant harms." Id. at 358 (internal citations omitted).

Defendant cites Cardova v. Textron Aviation, Inc., No. 23-1233-DDC, 2025 WL 1262487 (D. Kan. Apr. 30, 2025), for the proposition that questioning an employee about completion times and overzealously monitoring an employee's work are not adverse actions post-Muldrow. In Cardova, the Honorable Daniel D. Crabtree found that monitoring and questioning *alone* do not

---

[3]    Defendant also argues that its "follow up" to the Stepping It Up SYNC dated June 29, 2022 on July 21, 2022 was not adverse employment action. Because plaintiff failed to exhaust administrative remedies on that issue, the Court need not address defendant's argument.

constitute adverse actions, but his case differed in that no disadvantageous change or harm followed the monitoring and questioning.  In fact, plaintiff in <u>Cardova</u> never experienced discipline, reprimand or a negative evaluation.

Here, plaintiff suffered disadvantageous changes or harm to identifiable terms and conditions of his employment—decreased compensation and termination of employment—after defendant issued the expectation alignment and follow up.  Viewing the record in the light most favorable to plaintiff, defendant's challenged actions affected plaintiff's compensation package and increased the likelihood of his termination.  <u>Cordova</u>, 2025 WL 1262487, at *11 (reprimand constitutes adverse action if it adversely affects terms and conditions of employment such as likelihood plaintiff will be terminated, undermining current position or affecting future employment opportunities) (citing <u>Medina v. Income Support Div.</u>, 413 F.3d 1131, 1137 (10th Cir. 2005)).

These actions, in addition to others (such as termination of plaintiff's employment) create a genuine issue of material fact whether plaintiff experienced adverse employment action.

### 2.    Whether Plaintiff Can Establish An Inference Of Discrimination

Defendant argues that plaintiff cannot raise an inference of race discrimination because he can point to no similarly situated person who exhibited anywhere near the same performance problems, lack of reliability and failure to meet expectations.[4]  Plaintiff responds that he has raised an inference of race discrimination because (1) Chen treated him less favorably than

---

[4]    Defendant also argues that plaintiff cannot raise an inference of discrimination because (1) plaintiff repeatedly failed to complete his projects on time, (2) plaintiff repeatedly had unplanned absences and (3) plaintiff repeatedly missed meetings with his supervisor and teams, even after his managers placed him on a PIP.  These arguments go toward the question of pretext, not whether plaintiff raises an inference of discrimination. The Court therefore does not address defendant's arguments here.

similarly situated Asian co-workers, (2) T-Mobile replaced him with Asian individuals and (3) defendant wrongfully terminated his employment.

Plaintiff can raise an inference of discrimination by showing that defendant treated a similarly situated employee who is not in plaintiff's protected class more favorably than plaintiff. The Court considers individuals to be "similarly situated" when they (1) deal with the same supervisor, (2) are subject to the same standards governing performance evaluation and discipline and (3) have engaged in conduct of "comparable seriousness." E.E.O.C. v. PVNF, L.L.C., 487 F.3d 790, 801 (10th Cir. 2007).

Plaintiff claims that Chen treated Kapoor and Zhao, who are both Asian, more favorably by (1) allowing them to work in collaboration with others, (2) not punishing them for not having access to data environments and (3) not holding them to the same standards for training or attendance. The record reflects, however, that Kapoor and Zhao were not similarly situated to plaintiff. While they had the same manager and were subject to the same standards governing their performance and discipline, neither engaged in conduct of comparable seriousness to plaintiff. The undisputed record reflects that Kapoor regularly delivered her assignments on time, met or exceeded Chen's expectations and regularly attended meetings. Kapoor missed training sessions and did not have access to certain systems, but it is undisputed that if those were plaintiff's only deficiencies, Chen would not have placed plaintiff on a PIP. Likewise, though Zhao (like plaintiff) did not have access to certain systems, the record contains no evidence that she missed any meetings or failed to turn in any assignments. Plaintiff therefore has not shown that defendant treated him less favorably than similarly situated individuals outside his protected class. Also, the applicant pool for plaintiff's position consists largely of people of Asian descent. Therefore, standing alone, the fact that defendant replaced plaintiff with an Asian does not raise an inference

of discrimination.[5]  Plaintiff cites no similarly situated Asians whom T-Mobile treated more favorably than himself.

With respect to his wrongful termination claim, the Tenth Circuit has held that plaintiff may raise an inference of unlawful discrimination by showing that (1) he is a member of a protected class, (2) he is qualified for his job, (3) defendant fired him and (4) defendant did not eliminate his job.  Walkingstick, 125 F.4th at 1335.[6]  Plaintiff may show that he is qualified for his job by showing that he "possessed the basic skills necessary for the job" or "some evidence of good performance."  Id. at 1336.  Plaintiff need not show "superiority or flawless performance." Id.

Defendant does not dispute that (1) plaintiff is a member of a protected class, (2) it terminated his employment and (3) it did not eliminate his job.  For the first time in its reply brief, defendant argues that plaintiff was not qualified for his job because he failed to timely deliver work product.  The record reflects, however, that plaintiff possessed the necessary skills for his job and received praise for his performance throughout his tenure.  Therefore, with respect to his wrongful termination claim, plaintiff has raised an inference of race discrimination and established

---

[5]    The record reflects that after it terminated plaintiff's employment, T-Mobile hired an Asian employee (and two Asian contractors) to work under Chen's supervision.  The record reflects that since approximately 2022, individual managers such as Chen have made hiring decisions, so the Court assumes that Chen hired the employee.

[6]    The Supreme Court created this framework against a backdrop of historical workplace discrimination and presumably had in mind employees who belong to minority groups.  See Perry v. Woodward, 199 F.3d 1126, 1140 (10th Cir. 1999).  Given the Supreme Court's recent decision in Ames v. Ohio Dep't of Youth Servs., 605 U.S. 303 (2025), it seems that under this framework, any employee who is minimally qualified can automatically establish a prima facie case of discrimination if his or her employment is terminated.  Even so, since plaintiff has not shown evidence which raises a genuine issue of material fact whether defendant's proffered reasons for terminating his employment were pretextual, the Court proceeds under this framework without further analysis or guidance from higher courts.

a genuine issue of material fact as to his prima facie case.

In summary, because plaintiff has not established a prima facie case, defendant is entitled to summary judgment on plaintiff's race discrimination claims, except for plaintiff's claim that it terminated his employment because of race.

      C.      <u>Whether Plaintiff Can Establish Pretext</u>

For purposes of summary judgment, plaintiff has set forth a prima facie case of discrimination with respect to the termination of his employment. The burden therefore shifts to defendant to proffer a legitimate, non-discriminatory reason for its decision. Defendant claims that it terminated plaintiff's employment because of his lack of engagement and failure to deliver work product despite extensive coaching and deadline extensions.

Because defendant has offered non-discriminatory reasons, plaintiff must establish that defendant's offered legitimate reasons were not the true reasons for its decision but rather were pretext. See <u>Trujillo v. PacifiCorp</u>, 524 F.3d 1149, 1154–55 (10th Cir. 2008). To defeat summary judgment, plaintiff's burden is to demonstrate a genuine issue of material fact whether the proffered reasons are unworthy of belief. <u>Id.</u> at 1158. Plaintiff can show pretext by weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its action such that a reasonable factfinder could rationally find them unworthy of credence and infer that the employer did not act for the asserted non-discriminatory reasons. <u>Walkingstick</u>, 125 F.4th at 1337. The Court does not ask whether the employer's proffered reasons were wise, fair or correct, but only whether the employer honestly believed those reasons and acted in good faith upon those beliefs. <u>Debord v. Mercy Health Sys. of Kan., Inc.</u>, 737 F.3d 642, 655 (10th Cir. 2013).

Here, plaintiff argues that defendant's stated reasons were pretextual because (1) for the

first 20 years of his career, he received mostly positive feedback about his skill and dedication, (2) Bowman became his supervisor in 2016, and before the merger, Bowman documented no issues about plaintiff's performance, (3) plaintiff had no major performance issues until Chen became his supervisor in August of 2020, (4) Chen manufactured impossible deadlines and refused to acknowledge or take into account known data issues, (5) Chen forced plaintiff to work in isolation while the remainder of the team worked collaboratively and (6) Chen did not acknowledge plaintiff's 25th anniversary with T-Mobile.

The record of undisputed facts reflects that (1) defendant worked with plaintiff for years in an effort to convince him to deliver solid, reliable performance, (2) defendant did not treat anyone who had similar performance or behavior issues differently, (3) Bowman is also white, (4) other than plaintiff, the only employee Chen ever placed on a PIP is Asian, (5) Chen and Bowman promoted a white man, (6) Bowman terminated two white employees and three Asian employees, (7) plaintiff consistently missed meetings and deadlines without notice, (8) plaintiff agreed to send updates and did not, (9) plaintiff failed to complete assignments, (10) numerous supervisors identified the same performance problems for plaintiff dating back to 1999 (before the merger, when plaintiff admits that he did not experience discrimination) and (11) Chen did not feel comfortable sending an email about plaintiff's 25th anniversary because she felt it would be disingenuous.

Plaintiff has not shown a genuine issue of material fact as to pretext by arguing that for the first 20 years of his career, he received mostly positive feedback and that things only changed after Chen became his supervisor. The record demonstrates that throughout his tenure, plaintiff received negative feedback regarding his failure to complete assignments and be present in the office. Plaintiff's arguments are not only unsupported by the record; they also fail to suggest that T-

Mobile's stated reasons for terminating plaintiff's employment were untrue or a pretext for race discrimination.

Similarly, even if true, plaintiff's arguments that Chen manufactured impossible deadlines, refused to account for known data issues and forced plaintiff to work in isolation in Kansas while the remainder of the team worked collaboratively do not suggest that T-Mobile's stated reasons for terminating his employment were disingenuous.  The Court does not sit as a "super personnel department" to undue bad employment decisions.  Johnson v. Weld Cnty., Colo., 594 F.3d 1202, 1211 (10th Cir. 2010).  The record does not show that Chen's decision to terminate plaintiff's employment was unfair, unwise or incorrect, but even if it did, the record overwhelmingly supports defendant's stated reasons for the termination, and plaintiff's arguments do not tend to show that defendant did not honestly believe its stated reasons and act in good faith accordingly.

Finally, plaintiff's argument that Chen did not acknowledge his 25th work anniversary does not show pretext.  Though the parties do not allege the specific date of the anniversary, plaintiff began working at Sprint in 1998, so his 25th anniversary occurred in 2023—the same year that he complained about discrimination and retaliation, his performance issues came to a head and T-Mobile terminated his employment.  In light of these events, Chen's assertion that she did not acknowledge plaintiff's anniversary because she felt it would be disingenuous is not unworthy of belief.  Further, whatever her reasoning, Chen's failure to acknowledge the anniversary does not tend to show that defendant's stated reasons for terminating his employment were untrue or were pretexts for race discrimination.

No reasonable jury would conclude that defendant's stated reasons for terminating plaintiff's employment were pretexts for race discrimination.  Accordingly, the Court sustains defendant's motion for summary judgment on plaintiff's race discrimination claim.

## II.    Age Discrimination

The ADEA prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To prevail on an ADEA claim, plaintiff must prove by a preponderance of the evidence—either directly or circumstantially—that age was the "but-for" cause of the termination. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177–78 (2009) (citation omitted). When plaintiff presents circumstantial evidence of discrimination, as is the case here, the McDonnell Douglas burden-shifting framework applies. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); see Tabor v. Hilti, 703 F.3d 1206, 1216 (10th Cir. 2013).

To establish a prima facie case of age discrimination, plaintiff must prove that (1) he is a member of the protected class, (2) he suffered adverse employment action, (3) he was qualified for the position at issue and (4) the challenged action occurred under circumstances giving rise to an inference of discrimination. Jones v. Oklahoma City Pub. Sch., 617 F.3d 1273, 1279 (10th Cir. 2010). If plaintiff establishes a prima facie case, the burden shifts to defendant to identify a legitimate, nondiscriminatory reason for the adverse employment action. Id. at 1278. Once the employer does so, the burden shifts back to plaintiff to prove that defendant's stated reason was pretextual. Id.

### A.    Whether Plaintiff Can Establish A Prima Facie Case Of Age Discrimination

Defendant does not contest that plaintiff is a member of a protected class, i.e. over age 40, or that he was qualified for the position. Defendant argues, however, that many of plaintiff's alleged actions do not constitute adverse employment actions and that plaintiff cannot establish an inference of age discrimination.

### 1.      Whether Plaintiff Can Establish Adverse Employment Action

As with plaintiff's race discrimination claim, defendant (1) on July 21, 2022, issued the "follow up" to the Stepping it Up SYNC dated June 29, 2022, (2) in November/December of 2022, issued the "expectations alignment" and (3) on January 23, February 10 and March 10, 2023 issued the "follow up" to the that "expectations alignment."  Defendant argues that as a matter of law, these actions do not constitute adverse employment actions.

Both parties submitted combined briefing on plaintiff's claims for race and age discrimination.  Accordingly, the Court incorporates its above analysis and concludes that all three actions were related to and followed by more extreme disciplinary action — decreased compensation and termination of employment.  Viewing the record in the light most favorable to plaintiff, defendant's challenged actions affected plaintiff's compensation package and increased the likelihood of his termination.  Cordova, 2025 WL 1262487, at *11 (citing Medina, 413 F.3d at 1137) (reprimand constitutes adverse action if it adversely affects terms and conditions of employment such as likelihood plaintiff's employment will be terminated, or undermines current position or affects future employment opportunities).

### 2.      Whether Plaintiff Can Establish An Inference Of Discrimination

The Court also incorporates its above analysis for this element.  As discussed, with respect to his termination claim, plaintiff has raised an inference of age discrimination by showing that (1) he is a member of a protected class, (2) he is qualified for his job, (3) defendant fired him and (4) defendant did not eliminate his job.[7]  Walkingstick, 125 F.4th at 1335.

---

[7]      Defendant only disputes that plaintiff was qualified for his job.  The record reflects, however, that plaintiff "possessed the basic skills necessary for the job" and demonstrated "some evidence of good performance."  Id. at 1336.

Plaintiff has therefore raised an inference of discrimination and a genuine issue of material fact with regard to his prima facie case of age discrimination.  Plaintiff failed to show that defendant treated similarly situated comparators more favorably or to present any other evidence which raises an inference of discrimination with respect to his other claims.  The Court therefore sustains defendant's motion for summary judgment on plaintiff's other age discrimination claims.

B.    Whether Plaintiff Can Establish Pretext

For purposes of summary judgment, plaintiff has set forth a prima facie case of age discrimination with respect to the termination of his employment.  The burden therefore shifts to defendant to proffer a legitimate, non-discriminatory reason for its decision.  Defendant claims that it terminated plaintiff's employment because of his lack of engagement and failure to deliver work product despite extensive coaching and deadline extensions.

Because defendant has offered non-discriminatory reasons, plaintiff must establish that defendant's offered legitimate reasons were not the true reasons for its decision but rather were pretext.  See Trujillo v. PacifiCorp, 524 F.3d 1149, 1154–55 (10th Cir. 2008).  To defeat summary judgment, plaintiff's burden is only to demonstrate a genuine issue of material fact whether the proffered reasons are unworthy of belief.  Id. at 1158.  Plaintiff can show pretext by weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its action such that a reasonable factfinder could rationally find them unworthy of credence and infer that the employer did not act for the asserted non-discriminatory reasons.  Walkingstick Dixon, 125 F.4th at 1337.

The Court incorporates its above analysis of pretext and reiterates its prior holding.  The record does not reveal a genuine issue of material fact whether defendant's stated reasons for terminating plaintiff's employment were a pretext for age discrimination.

-48-

Accordingly, the Court sustains defendant's motion for summary judgment regarding plaintiff's age discrimination claim.

## III.    Retaliation

Where plaintiff seeks to establish a retaliation claim through indirect or circumstantial evidence, the burden-shifting framework of McDonnell Douglas applies.  Pinkerton v. Colo. Dep't of Transp., 563 F.3d 1052, 1064 (10th Cir. 2009).  Once plaintiff has demonstrated a prima facie case, the burden shifts to defendant to "articulate a legitimate, nondiscriminatory reason for the adverse employment action."  Meiners v. Univ. of Kan., 359 F.3d 1222, 1229 (10th Cir. 2004).  If defendant articulates legitimate reasons for the action, then plaintiff must demonstrate that the asserted reasons were pretextual.  Id.

To establish a prima facie case of retaliation under Title VII and the ADEA, plaintiff must demonstrate that (1) he engaged in protected opposition to discrimination; (2) he suffered adverse employment action which would dissuade a reasonable worker from making or supporting a charge of discrimination; and (3) a causal connection exists between his protected activity and the adverse action.  See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006); Fassbender v. Correct Care Sols., LLC, 890 F.3d 875, 890 (10th Cir. 2018); Mauldin v. Driscoll, 136 F.4th 984, 995 (10th Cir. 2025).

Defendant argues that (1) plaintiff did not engage in protected activity under Title VII until after the termination of his employment, (2) plaintiff cites only two instances of adverse employment action, (3) plaintiff cannot establish a causal connection between his protected activity and any adverse action and (4) the record is devoid of any evidence of pretext.

### A.    Whether Plaintiff Can Establish That He Engaged In Protected Activity

Defendant agrees that plaintiff engaged in protected activity under the ADEA.  Defendant

argues that prior to his termination, however, plaintiff did not engage in any activity which Title VII protects.

Under Title VII, protected activity "includes either (1) participating in or initiating a Title VII proceeding or (2) opposing discrimination made unlawful by Title VII." Boese v. Fort Hays State Univ., 814 F. Supp. 2d 1138, 1146 (D. Kan. 2011), aff'd, 462 F. App'x 797 (10th Cir. 2012). Plaintiff need not show that he reported an actual Title VII violation, as long as he can show a "reasonable good-faith belief that [he] was opposing discrimination." Fassbender, 890 F.3d at 890.

Defendant argues that plaintiff did not engage in protected activity under Title VII until July of 2023, after his termination. Plaintiff responds that on August 4, 2022 and April 21, 2023, he complained to HR, describing several instances of Chen treating Asian co-workers more favorably. The record reflects, however, that those complaints were about age discrimination, not race discrimination. His complaints did not mention, or even allude to, race. The fact that his younger co-workers happened to be Asian does not make plaintiff's complaint protected activity under Title VII. Accordingly, the Court sustains defendant's motion for summary judgment with respect to plaintiff's Title VII retaliation claims.

B.    Whether Plaintiff Can Establish Adverse Action

Plaintiff alleges that he suffered adverse action when defendant (1) issued the "expectations alignment" of November/December of 2022 (2) issued the "follow up" to that "expectations alignment on January 23, February 10 and March 10, 2023, (3) issued the annual bonus and raise reduction in February of 2023, (4) issued the Not In Good Standing on March 23, 2023, (5) terminated his employment on June 1, 2023 and (6) failed to take any meaningful action in response to plaintiff's complaints of discrimination and retaliation dated August of 2022 and April

of 2023.   Defendant argues that only the annual bonus and raise reduction and termination constitute adverse employment actions.

As discussed, while Muldrow altered the standard for Title VII discrimination claims, it distinguished adverse employment action in the context of Title VII retaliation claims.  Muldrow, 601 U.S. at 357.  Though the Supreme Court purported to lower the bar for adverse employment action in discrimination cases, it reaffirmed that in retaliation cases, plaintiff must still show that the retaliatory action caused a "significant" harm, i.e. the employer took action serious enough to dissuade a reasonable worker from making or supporting a charge of discrimination.  Id.; Burlington, 548 U.S. at 68.

In the retaliation context, adverse action is action which would dissuade a reasonable worker from making or supporting a charge of discrimination.  See Burlington, 548 U.S. at 68; Fassbender v. Correct Care Sols., LLC, 890 F.3d 875, 890 (10th Cir. 2018).  Courts have found that negative performance reviews and failure to investigate do not constitute adverse employment action.  Sotunde v. Safeway, Inc., 716 F. App'x 758, 768 (10th Cir. 2017) (lower performance evaluation that still reflected satisfactory remarks did not support claim of retaliation); Henrie v. Carbon Sch. Dist., No. 22-4015, 2023 WL 1948621, at *3 (10th Cir. Feb. 13, 2023) (informal disciplinary letter not adverse action); Cordova v. Textron Aviation, Inc., 2025 WL 1262487 (D. Kan. Apr. 30, 2025) (questioning employee about completion times and monitoring work not materially adverse); Daniels v. United Parcel Serv., Inc., 701 F.3d 620, 640 (10th Cir. 2012), abrogated by Muldrow v. City of St. Louis, Mo., 601 U.S. 346 (2024) (failure to investigate internal discrimination complaint not materially adverse).

Here, defendant communicating its expectations to plaintiff and following up about those expectations would not dissuade a reasonable employee from making a discrimination claim.

Therefore, the "expectations alignment" of November/December of 2022 and the "follow up" to that "expectations alignment" on January 23, February 10 and March 10, 2023 do not constitute adverse action. On the other hand, receiving a Not in Good Standing could dissuade a reasonable employee from making a discrimination claim. See Ford v. Jackson Nat'l Life Ins. Co., 45 F.4th 1202, 1226 (10th Cir. 2022) (PIP is adverse action if causes significant change in employment status).

With this adverse employment action, along with the annual bonus and raise reduction in in February of 2023 and the termination on June 1, 2023, plaintiff has satisfied the second element of his prima facie case.

C.    Whether Plaintiff Can Establish A Causal Connection

Defendant argues that plaintiff cannot establish a causal connection between his protected activity and any adverse action because (1) plaintiff admits that he suffered no discrimination before the merger, yet his Sprint supervisors repeatedly documented the same concerns about his behavior and (2) when plaintiff began reporting to Chen, he followed the same pattern of failing to deliver assignments in a timely manner, failing to attend meetings and taking numerous unplanned absences followed by short-lived improvement after a PIP then reverting to old patterns.

Plaintiff may show a causal connection by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." Burrus v. United Tel. Co. of Kan., Inc., 683 F.2d 339, 343 (10th Cir. 1982). Generally, "if the adverse action occurs in a brief period up to one and a half months after the protected activity, temporal proximity alone will be sufficient to establish the requisite causal inference." Conroy v. Vilsack, 707 F.3d 1163, 1181 (10th Cir. 2013).

The record reflects that on March 20 and April 7, 2023, plaintiff complained to the EEOC

about age discrimination and retaliation, and on April 21, he complained to defendant about age discrimination and retaliation.  Three days after his first EEOC complaint, on March 23, 2023, defendant issued the Not In Good Standing.  On June 1, 2023, less than two months after his complaint to defendant, defendant fired plaintiff.  Plaintiff has therefore established a genuine issue of material fact as to a causal connection and has established a prima facie case of retaliation with respect to the issuance of the Not In Good Standing and the termination of his employment.

The record does not reflect that plaintiff engaged in any protected activity prior to February of 2023, when T-Mobile issued his annual raise and bonus reduction.  As such, plaintiff has failed to establish a causal connection and prima facie case of retaliation with respect to his annual raise and bonus reduction.

D.      Whether Plaintiff Can Establish Pretext

Defendant argues that even if plaintiff can establish a prima facie case of retaliation, he cannot prove that its legitimate non-discriminatory reasons for its actions were pretextual for illegal retaliation.

The Court again incorporates its above pretext analysis, finding that the record contains no evidence that defendant's proffered reasons for issuing the Not In Good Standing or terminating plaintiff's employment were pretext for illegal retaliation.

Accordingly, the Court sustains defendant's motion for summary judgment on plaintiff's retaliation claims.

**IT IS THEREFORE ORDERED** that defendant's <u>Motion For Summary Judgment</u> (Doc. #59) filed August 1, 2025 is **SUSTAINED.**

**IT IS FURTHER ORDERED** that the status conference set for September 24th at 3:00 P.M. is **CANCELLED.**

Dated this 24th day of September, 2025 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge